Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2743 | **DATE** | 12/8/2000 |
| **CASE TITLE** | JOSEPH L. WALSH vs. ANDERSEN CONSULTING LLP | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] The motion for summary judgment [12-1] is granted. Judgment is entered in favor of defendant Andersen Consulting LLP and against plaintiff Joseph Walsh. ENTER MEMORANDUM OPINION AND ORDER.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | DEC 11 2000 date docketed | 25 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 12/8/2000 date mailed notice | |
| | Copy to judge/magistrate judge. | | |
| SB courtroom deputy's initials | | ED-Y FILED FOR DOCKETING 00 DEC -8 PM 6:50 | jad |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
**DEC 1 1 2000**

JOSEPH L. WALSH,           )
                           )
              Plaintiff,   )   No. 00 C 2743
                           )
         v.                )   Suzanne B. Conlon, Judge
                           )
ANDERSEN CONSULTING LLP, an Illinois )
limited liability partnership,       )
                           )
              Defendant.   )

## MEMORANDUM OPINION AND ORDER

Joseph Walsh sues Andersen Consulting LLP ("Andersen Consulting") for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, claiming Andersen Consulting discriminated against him due to a mental disability and by failing to accommodate his disability. Andersen Consulting moves for summary judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.

## BACKGROUND

**I      Walsh's employment at Andersen Consulting**

Andersen Consulting is a global management and technology consulting firm. Plaintiff's Answer to Defendant's Local Rule 56.1 Statement of Undisputed Facts ("Pl. Facts"), ¶ 3. Walsh began working for Andersen Consulting on September 21, 1998 as a Programmer / Analyst and continued in that position until his termination on April 15, 1999. *Id.* at ¶¶ 4, 5. Throughout his employment, Walsh was assigned to the Integrated Risk Management Systems ("IRMS") project for Andersen Consulting client Allstate Insurance Company ("Allstate"). *Id.* at ¶ 5. Walsh worked on-site at Allstate's Riverwalk building in Buffalo Grove, Illinois during the entirety of his employment with Andersen Consulting. *Id.*



Allstate is a major client of Andersen Consulting. *Id.* at ¶ 6. Andersen Consulting developed an underwriting system for Allstate and continues to provide system development and maintenance services for the system. *Id.* Walsh was one of hundreds of Andersen Consulting programmers and analysts working to redesign Allstate's computer system requirements to enable Allstate to access policy and underwriting information at its offices around the country. *Id.* at ¶ 7. Walsh was aware of the importance of the relationship between Andersen Consulting and Allstate, knowing it to be one of Andersen Consulting's largest contracts in the country. *Id.* at ¶ 8.

Walsh's general responsibilities were to retrieve, code and test modules as part of the Integrated Data Center Management ("ICDM") resolution, a method of error correction. *Id.* at ¶ 9. Walsh was informed that acting professionally and honestly at all times and communicating with co-workers was an important part of his job. *Id.* at ¶ 10. At the time of his termination, Walsh reported to Mike Bishop, his team leader, and Tim Cox, his project leader. *Id.* at ¶ 11. Cox, in turn, reported to Joseph Owano, the project manager. *Id.* Peter Ganzel was the human resources manager assigned to the Allstate project. *Id. at* ¶ 14. Elizabeth Rafferty was a human resources specialist who worked with employees at the Allstate location on a situational basis. *Id.* at ¶ 15. Rafferty reported to Ganzel. *Id.*

**II    Walsh's job performance**

During the first quarter of 1999, Walsh missed several project deadlines. *Id.* at ¶ 16. The projects were near completion, but missing one element. That element was a computer language called "DB2" that allowed the program Walsh coded to interface with the Allstate database. *Id.* Walsh was unable to add the DB2 language to these projects because he had not received training in the DB2 language. *Id.*

Sometime in February or March 1999, Walsh contacted human resources specialist Elizabeth Rafferty to inform her he needed additional DB2 training. *Id.* at ¶ 27. Rafferty gave Walsh DB2 computer-based training courses to allow Walsh to train himself at home. *Id.* When he could not load the courses onto his home computer, Rafferty arranged for him to complete the courses at work. *Id.*

On April 13, 1999, Cox sent Rafferty a document discussing the deadlines Walsh had missed. *Id.* at ¶ 22. Andersen Consulting asserts the document was used to draft a "performance improvement plan" to be given to Walsh; Walsh would then have sixty days to improve his performance. Defendant's Local Rule 56.1 Statement of Undisputed Facts ("Def. Facts"), ¶¶ 21-22. The performance improvement plan was never finalized and given to Walsh, as he was terminated on April 15, 1999, prior to its completion. Pl. Facts, ¶ 23. Despite the missed deadlines and the preparation of a performance improvement plan, Walsh's job performance played no role in his termination by Ganzel. Plaintiff's Local Rule 56.1 Statement of Additional Undisputed Facts ("Pl. Add. Facts"), ¶ 7.

### III  Walsh's Meeting with Human Resources Specialist Elizabeth Rafferty

On April 14, 1999, Walsh had a meeting with Rafferty. The subjects discussed at this meeting are disputed. Both parties agree Walsh requested that the meeting take place outside the Allstate Riverwalk building. *Id.* Both parties agree Walsh explained to Rafferty at the meeting that his doctor had diagnosed him with a mental illness and recommended he go on short-term disability leave to begin a drug therapy program. *Id.* at ¶ 28. This was the first time Rafferty was informed of Walsh's mental illness. *Id.* at ¶ 30. According to Walsh, that was the extent of the meeting.

Rafferty and Andersen Consulting, however, tell a different story. They assert Walsh told Rafferty during the meeting that Walsh and his wife did not agree with the doctor's diagnosis that Walsh was mentally ill. Def. Facts, ¶ 29. They further assert Walsh told Rafferty that he wanted her

to help prove that he was not mentally ill. *Id.*, ¶ 31. In order to prove this, Walsh informed Rafferty that on Monday, April 12, 1999, at around 12:30 a.m., he had made a call and "planted" a statement indicating that an Andersen Consulting employee was taking Allstate information and selling it to other companies. *Id.* at ¶ 32. He knew this "plant" was false, but he was doing it as a test. *Id.* at ¶ 33. The test was modeled after a "barium-test" used in a book called *Spy Catcher*, and was used to determine whether there is a "leak" in a system. *Id.* Walsh showed the book to Rafferty. *Id.* Walsh told Rafferty that the "plant" was a test of his own, and asked Rafferty to let him know if anything about the message got back to her. *Id.* Andersen Consulting and Rafferty also assert Walsh told Rafferty about an incident with co-worker Scott Covey, who had worked on the IRMS project until December 1998; Walsh said Covey told him, "I don't like you." *Id.* at ¶¶ 34 - 35. Walsh also told Rafferty that Covey had written "get out" on a whiteboard, and he believed Covey's statement was directed at him. *Id.* at ¶ 35. Walsh denies making any statements about the "plant" or about the Covey situation during his meeting with Rafferty.

Later that evening, Rafferty received a voice mail from Walsh indicating he had overheard individuals in the next cubicle talking about Covey. Pl. Facts, ¶ 36. The voicemail asks if Rafferty had "discussed the Covey situation with someone." Def. Facts, ¶ 36; Def. Facts, Rafferty Ex. 1.[1] Andersen Consulting and Rafferty assert the only conceivable conversation Walsh could have been referring to was the conversation earlier that day between Walsh and Rafferty. Def. Facts, ¶ 36. Walsh does not deny leaving the message, but maintains the message was not regarding his conversation with Rafferty earlier that day. Pl. Facts, ¶ 36.

---

[1]Rafferty Exhibit 1 is an audio tape of the voicemail message Walsh left for Rafferty on April 14, 1999.

4

## IV  Walsh's termination

On the evening of April 14, 1999, Rafferty left Ganzel a voicemail regarding her belief Walsh had planted a message that an Andersen Consulting employee was selling Allstate information. Def. Facts, ¶ 38. Ganzel and Rafferty were concerned about the potential effect of the message on Andersen Consulting's relationship with Allstate. *Id.* at ¶ 39. Ganzel met with Rafferty, Paul Matalliano, an Andersen Consulting senior manager, and a representative from human resources and legal resources to discuss the situation. *Id.* at ¶ 40-41. As a result of these meetings, Ganzel made a preliminary decision to fire Walsh, but wanted to talk to him first and give him an opportunity to respond to the allegations. *Id.* at ¶ 41. Ganzel also met with Owano, Walsh's project manager, who concurred with Ganzel's decision to fire Walsh. *Id.* at ¶ 42.

At the end of the day on April 15, 1999, Ganzel met with Walsh; Rafferty and Owano were present. *Id.* at ¶ 43. At the meeting, Walsh denied leaving a "plant" message about an Andersen Consulting employee selling Allstate information. Pl. Facts, ¶ 44. Andersen Consulting asserts Walsh denied raising any issues about Covey and leaving a voicemail with Rafferty regarding Covey (Def. Facts, ¶ 44), but Walsh denies he was asked anything about Covey during the meeting. Pl. Facts, ¶ 44.

During the meeting, Ganzel concluded Walsh was lying about his conduct and decided to fire him for unprofessional conduct and lack of integrity. Def. Facts, ¶ 45. Ganzel had fired several other Andersen Consulting employees previously for lying about conduct. *Id.* at 47-48. Ganzel was not aware of Walsh's mental illness at the time he decided to fire him. *Id.* at ¶ 57. However, at some point during the course of the meeting, Walsh did request an accommodation from Ganzel. Pl. Add. Facts, ¶ 17.

## V       Walsh's Mental Disability

Walsh was first diagnosed with delusional disease on April 4 or 5, 1999 by Dr. David McNeil. Pl. Facts, ¶ 49. The primary symptoms of Walsh's condition are weakness in his arms, a flush in his face and a nervous feeling. *Id.* at ¶ 51. If the condition results in Walsh's blood pressure becoming extremely high, he may also experience memory loss. *Id.*

Walsh began taking psychotropic drugs to control his condition in February 1999. *Id.* at ¶ 52. Within a few months after his termination, Walsh began working part-time. *Id.* at ¶ 53. In September 1999, Walsh started working full-time as a programmer with Comgraphics, his current employer, at a higher salary than he had received at Andersen Consulting. *Id.* at ¶ 53. While at Comgraphics, Walsh has not taken any leaves of absence, missed any days of work, nor experienced any effects from his condition. *Id.* at ¶ 54. He has not requested any accommodations for his disability from Comgraphics. *Id.*

## DISCUSSION

### I       Summary judgment standard

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view the record and draw all reasonable inferences in the light most favorable to the nonmoving party. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P.56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility dominate. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). However, "there is no separate rule of civil procedure in employment cases;" rather, the added rigor language means only that "courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Only disputes that could affect the outcome of the suit will preclude an entry of judgment for the moving party. *Thomas & Betts*, 138 F.3d at 291.

## II  *Prima facie* case of ADA discrimination

To establish a claim of ADA discrimination, Walsh must demonstrate: (1) he was disabled; (2) his work performance met Andersen Consulting's legitimate expectations; (3) he was terminated; and (4) the circumstances surrounding his termination indicate it is more likely than not his disability was the reason for termination. *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).

### 1  Disability under the ADA

The ADA proscribes employers from discriminating against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the

7

employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Therefore, this court must first address whether Walsh's condition qualifies as a "disability" as defined under the ADA.

For the purposes of Walsh's claim, a disability includes a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12101(2)(A); *Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000). "Substantially limits" means the person is either unable to perform a major life function or is significantly restricted in "the duration, manner or condition under which [the] individual can perform a particular major life activity, as compared to the average person in the general population." 29 C.F.R. § 1630.2(j). Walsh alleges he is disabled with respect to the major life activity of working. With respect to this major life activity, "substantially limits" means the individual is significantly restricted in "the ability to perform a class of jobs or a broad range of jobs in various classes." *Webb*, 230 F.3d at 998. "Thus, an individual is not substantially limited in working just because he or she is unable to perform a particular job for one employer, or because he or she is unable to perform a specialized job or profession requiring extraordinary skill, prowess or talent"; instead, "the impairment must substantially limit employment generally." 29 C.F.R. § 1630.2(j), App. (1999); *Webb*, 230 F.3d at 998. Walsh has the burden of demonstrating his impairment limited an entire class of jobs. *Webb*, 230 F.3d at 998.

Walsh has failed to meet his burden of proving his mental illness substantially limited the major life activity of working. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999). Walsh has not alleged he is unable to work in a broad class of jobs due to his disability. In fact, he admits his

condition does not affect his ability to work as a computer programmer. Plaintiff's Response to Defendant's Motion for Summary Judgment ("Pl. Resp."), 4. Walsh asserts his "condition affects his ability to do work in general, not his ability to work as a computer programmer." *Id.* With this assertion, Walsh has admitted that his disability fails to substantially limit the major life activity of working, the only major life activity Walsh asserts his disability affects. As a result, Walsh has failed to meet the first prong of the *prima facie* case.

### 2  Work performance and termination

There is a genuine issue of material fact as to whether Walsh has met the second prong of the *prima facie* case of disability discrimination – whether his work performance met Andersen Consulting's legitimate expectations. Andersen Consulting admits Walsh's job performance played no role in his termination. Though this does not mean *per se* that Walsh was performing to Andersen Consulting's expectations, Andersen Consulting's preparation of a plan to improve Walsh's performance indicates that his performance was not so deficient that termination was considered appropriate. Further, the record is not fully developed as to the DB2 training Walsh was to receive. Was it a job requirement of applicants for Walsh's position to have knowledge of the DB2 programming language? Was it the company's responsibility to provide the DB2 training to Walsh? Were other programmers unable to complete their projects by deadline because of an inability to use the DB2 programming language? The record is silent on these questions, and therefore this court may not find, as a matter of law, that Walsh has failed to meet the second prong of the *prima facie* case.

There is no dispute that Walsh was terminated. Thus, he has met the third prong of the *prima facie* case of disability discrimination.

### 3  Reason for Walsh's termination

Even if Walsh were able to establish he is disabled within the meaning of the ADA, he has failed to establish that his disability was the reason for termination, the fourth element of a *prima facie* case of disability discrimination. An employer may not be held liable under the ADA for firing an employee when it had no knowledge of the disability. *Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306, 307 (7th Cir. 1998). Walsh has failed to meet his burden of producing evidence to show Ganzel fired him because of his mental disability.

Ganzel testified in his deposition that he was unaware of Walsh's mental disability at the time he fired Walsh. Def. Facts, Ganzel Dep. at 41, 60-61. Walsh never told Ganzel he was disabled. Rather, he told Rafferty of his disability during the April 14, 1999 meeting. Pl. Facts, ¶ 55. Rafferty did talk to Ganzel later that evening about her conversation with Walsh. However, Rafferty testified in her deposition that she only talked with Ganzel about Walsh's statements concerning the "plant" message about an Andersen Consulting employee selling Allstate information. Def. Facts, Rafferty Dep. at 48. Walsh has produced no evidence to support his argument that Ganzel was told of his disability during Ganzel's conversation with Rafferty. The only evidence produced by Walsh is his own affidavit, in which he states, "[b]ecause I explained my mental illness to Rafferty on April 14, 1999, and Rafferty conveyed the contents of our conversation to Peter Ganzel, I believe Ganzel was aware of my mental illness before he fired me." Pl. Facts, Walsh Aff., ¶ 7. Walsh's self-serving statement standing alone is insufficient to raise a genuine issue of material fact. *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991). It is unsupported speculation. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). Because Walsh has not produced evidence to support his claim that

Ganzel knew of his disability when he was fired, Walsh fails to meet the fourth prong of the *prima facie* case of disability discrimination.

Walsh argues he requested an accommodation during his meeting with Ganzel, so Ganzel must have known of his disability when he was terminated. However, the record establishes Ganzel had made a preliminary decision to terminate Walsh prior to the April 15th meeting. He had discussed Walsh's termination with Rafferty, Paul Matalliano, an Andersen Consulting senior manager, and a representative from human resources and legal resources. Def. Facts, ¶ 40-41. Ganzel also discussed his intention to fire Walsh with Owano, Walsh's project manager, who concurred with Ganzel's decision. *Id.* at ¶ 42. Ganzel then met with Walsh and asked him about his meeting with Rafferty. Upon hearing Walsh deny statements Rafferty claimed he had made, Ganzel concluded Walsh was lying about his conduct and decided to fire him for unprofessional conduct. *Id.* at ¶ 45. All of these actions took place before Walsh requested an accommodation. As a result, this argument does not create a genuine issue of material fact as to whether Ganzel knew of Walsh's disability when he decided to terminate him.

### 3    Pretext

Even if Walsh were able to meet the *prima facie* case for disability discrimination, Andersen Consulting has offered a legitimate, nondiscriminatory reason for Walsh's termination - that Ganzel believed Walsh was lying. The burden then shifts to Walsh to demonstrate Andersen Consulting's proffered rationale for the termination was pretextual. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993). Walsh has produced no evidence to show Ganzel did not actually believe Walsh was lying when he denied the statements Rafferty accused him of making. Therefore, he has failed to meet his burden of showing that Andersen Consulting's explanation for his termination was pretextual.

11

Walsh asserts his denial that he ever discussed a "plant" message or a situation involving Covey with Rafferty creates a genuine issue of material fact as to whether his firing is pretextual. This court does not decide whether Walsh in fact conducted the "plant" test or whether Walsh ever informed Rafferty of such a test. Similarly, this court does not decide whether Walsh ever discussed the Covey situation with Rafferty, or whether the voicemail Walsh left on Rafferty's phone involved Walsh's discussion with Rafferty earlier that day. Walsh asserts "there is a genuine issue of fact as to whether Plaintiff ever engaged in misconduct." Pl. Resp., 7. Walsh is correct. However, there is no evidence to show Ganzel did not have a genuine belief that Walsh had engaged in misconduct. Ganzel's belief need not be correct in order for summary judgment to be appropriate. Walsh has failed to demonstrate Ganzel's, and therefore Andersen Consulting's, proffered reason for firing Walsh is pretextual, and summary judgment must be granted.

**III    Reasonable accommodation claim**

Walsh does not dispute Andersen Consulting's argument it is entitled to summary judgment on Walsh's claim he was denied a reasonable accommodation. The record establishes Ganzel and Andersen Consulting made the decision to terminate Walsh prior to his request for a reasonable accommodation from Walsh. Requesting an accommodation after an employer has made a legitimate decision to terminate does not entitle an employee to an accommodation. An employer is not required to give an employee a second chance as an accommodation. *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995). Thus, summary judgment must be granted on Walsh's claim he was entitled to a reasonable accommodation.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

December 8, 2000